LEGAL AID SOCIETY OF HAWAI‘I
Nicholas Severson (HI 011192)
nicholas.severson@legalaidhawaii.org
Cynthia Moore (HI 011256)
cynthia.moore@legalaidhawaii.org
Morgan Sasaki (HI 011736)
morgan.sasaki@legalaidhawaii.org
924 Bethel Street
Honolulu, Hawai‘i 96813
Tel:  (808) 527-8039

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| **SINISIO SARAFIN and LEGAL AID SOCIETY OF HAWAI'I,** ) | **Case** |
| ) | |
| **Plaintiffs,** ) | **COMPLAINT** |
| ) | |
| **vs.** ) | |
| ) | |
| **HAWAI'I PUBLIC HOUSING AUTHORITY, HAKIM OUANSAFI, personally and as Executive Director, and RYAN AKAMINE, personally and as Chief  Compliance Officer,** ) ) ) ) ) | |
| ) | |
| **Defendants** ) | |

1.     Sinisio Sarafin and the Legal Aid Society of Hawai'i hereby sue the Hawai'i Public Housing Authority and two officials for discrimination on the basis of disability and national origin in violation of the Fair Housing Act, Americans with Disabilities Act, the Civil Rights Act of 1964, the Rehabilitation Act of 1973, and related state laws as follows:

## I. JURISDICTION AND VENUE

2.      Subject matter jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331 in that the claims alleged herein arise under the Fair Housing Act, Americans with Disabilities Act, and other federal statutes.   The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' state law claims because those claims arise out of a common nucleus of operative facts, and form part of the same case or controversy under Article III of the United States Constitution.

3.      Venue is proper under 28 U.S.C. § 1391 in that the claims alleged herein arose within the City and County of Honolulu.

## II. PARTIES

4.      Plaintiff Sinisio Sarafin ("Sarafin"), age 74, is a Hawai'i Public Housing Authority program recipient and tenant. Sarafin suffers from a variety of physical impairments that substantially limit his mobility; accordingly, he is a qualified person with disabilities within the meaning of the Fair Housing Act, 42 U.S.C. § 3602(h), Americans with Disabilities Act, 42 U.S.C. § 12131(2), and the Rehabilitation Act, 29 U.S.C. § 794.   Sarafin is a native of the island of Chuuk, Federated States of Micronesia (FSM), and an FSM citizen residing in the United States. His primary language is Chuukese, a branch of the Malayo Polynesian language group and the most common language spoken in the FSM.   Accordingly, Sarafin is a Limited English Proficient ("LEP") person within the meaning of Section 601 of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d-1.

5.      Founded in 1950, Plaintiff Legal Aid Society of Hawai'i ("LASH") is Hawai'i's oldest and largest nonprofit law firm.  It engages in legal advocacy,

outreach, and education throughout the state in an effort to provide access to justice to those from disadvantaged backgrounds.  It operates ten offices covering the islands of O`ahu, Hawai`i, Maui, Kaua`i, Lana`i, and Moloka`i.   LASH is funded through private contributions and governmental sources, including the Fair Housing Initiatives Program ("FHIP") administered by the United States Department of Housing and Urban Development ("HUD").   Under the FHIP program, LASH must receive fair housing complaints, conduct fair housing investigations, and seek enforcement of fair housing laws by pursuing administrative complaints and lawsuits that result in consent decrees and legal settlements.

6.      Defendant Hawai'i Public Housing Authority ("HPHA") is an agency of the Department of Human Services of the State of Hawai'i.  HPHA is a "public entity" within the meaning of the ADA, 42 U.S.C § 12131(1)(B), and a "recipient of federal financial assistance" within the meaning of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, et seq., and Section 504 of Rehabilitation Act, 29 U.S.C. § 749.

7.      Defendant Hakim Ouansafi ("Ouansafi") is the Executive Director of HPHA.  Ouansafi is sued in his official and personal capacities.  Ouansafi is responsible for HPHA's compliance with federal and state laws prohibiting discrimination in HPHA's housing, programs and services.  Ouansafi is specifically charged with supervision, implementation, and reporting HPHA's compliance with federal and state civil rights statutes.  As such, Ouansafi may be personally liable for injuries suffered by Sarafin as a result of his failure or refusal to ensure HPHA's compliance with applicable federal and state laws.

8.     Defendant Ryan Akamine ("Akamine") is HPHA's Chief Compliance Officer and Section 504 Coordinator.   Akamine is sued in his official and personal capacities.   Akamine is responsible for implementing and executing HPHA's compliance with federal and state laws that prohibit discrimination in HPHA's housing, programs and services.   Akamine is specifically charged with the implementation, evaluation, and determination of requests for reasonable accommodation and modification and for the provision of interpretation services to LEP persons.   As such, Akamine may be personally liable for injuries suffered by Sarafin as a result of his failure or refusal to comply with applicable federal and state laws.

### III.   FACTUAL ALLEGATIONS

### A.  HPHA's Public Housing

9.     HPHA is a public housing authority.  Originally established in 1935 as the Hawaiʻi Housing Authority, HPHA's current mission and structure was established by the Legislature in 2005.  (Act 196, SLH 2005, as amended by Act 180, SLH 2006.)

10.     HPHA owns and operates public housing projects on every major island, except for Lanaʻi, Kahoʻolawe, and Niʻihau.  As of 2023, HPHA reported that it owned and operated 88 public housing projects containing 5,406 public housing units.  HPHA groups its public housing projects into 17 separate Asset Management Projects (AMPs), an organizational tool mandated by HUD.

11.     HPHA owns and operates two types of public housing projects. The first is Federal Public Housing Projects, which are "low-income federally assisted housing project[s] as established by the United States Housing Act of 1937, as

amended, and controlled, owned, developed, or managed by the authority pursuant to the federal low-rent public housing program." HRS § 356D-91. The second is State Low-Income Housing Projects, which are "state low-income public housing project[s] and program[s] or elder or elderly housing owned, managed, administered, or operated by the authority in accordance with sections 356D-44 and 356D." HRS § 356D-61.

12.    Although HPHA operates two types of low-income public housing projects, every HPHA housing project – state as well as federal – is subject to the civil rights protections provided HPHA's tenants under each federal statute invoked in this action.

13.    HPHA's principal source of revenue is federal funds administered by HUD.  To obtain those HUD funds, HPHA must execute every fiscal year a new Annual Contributions Contract ("ACC").  Under each ACC,  HUD agrees to grant federal funds to HPHA and HPHA agrees to administer all of its housing and programs in accordance with federal laws prohibiting discrimination, including the statute invoked by Plaintiffs in this action.[1]  Since at least 2013, Ouansafi has

---

[1] The ACC is a standard form contract (HUD-53012) used by HUD to fund local public housing authorities.  Paragraph 17 of the ACC requires that HPHA operate in accordance with "with all statutory, regulatory, and executive order requirements pertaining to civil rights,  equal opportunity, and nondiscrimination, as those requirements now exist, or as they may be enacted, promulgated, or amended from time to time. These requirements include, but shall not be limited to, compliance with at least the following authorities: Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d; 24 CFR part 1); the Fair Housing Act (42 U.S.C. 3601-3619; 24 CFR part 100); section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794; 24 CFR part 8); (the Age Discrimination Act of 1975 (42 U.S.C. 6101¬6107; 24 CFR part 146); the Americans with Disabilities Act (Pub. L. 101-336, approved July 26, 1990; 28 CFR part 35); Executive Order 11063 on Equal Opportunity in Housing (24 CFR part 107); Executive Order 11246 on Equal Employment Opportunity, as amended by Executive Order 11375 (41 CFR part 60); and Executive Order 12892 on Affirmatively Furthering Fair Housing."

executed each ACC with HUD.

14.     HPHA also receives state funding, typically through annual appropriations by the Legislature.  As a recipient of "state financial assistance," HPHA is subject to several state civil rights statutes that, generally, mirror the provisions of the federal statutes invoked by Plaintiffs in this action.

15.     Since at least 2013, Ouansafi as HPHA's executive director has been responsible for HPHA's implementation and compliance with federal and state laws prohibiting discrimination.  Since at least 2021, Akamine as HPHA's chief compliance officer has been responsible for the execution of HPHA's compliance with federal and state laws prohibiting discrimination.

### B.  Sarafin's HPHA Housing:  Puahala Homes IV

16.     In 2005, Sarafin, then age 56, immigrated to Oahu from the island of Chuuk, Federated States of Micronesia, where he had lived since birth. On Chuuk, Sarafin spoke Chuukese exclusively in school and at home and work; it remains his primary language.

17.     Since coming to O'ahu, Sarafin has worked, married, fathered children, became a widower, and remarried.  He also has become increasingly disabled with age.

18.     By 2019, Sarafin, then age 70, was living in Honolulu in a studio apartment with Kunia, his second wife, and their two teenage children.  In May 2019, HPHA approved the Sarafin family for rental of Apartment 1CL, a two-bedroom unit at the Puahala Homes IV apartments, one of HPHA's state low-income housing projects.

19.     After living in a studio, the Sarafin family welcomed the larger living

space provided in Apartment 1CL.   But over time, Sarafin found it increasingly

difficult to access Apartment ICL due to his disabilities.

20.      To exit Apartment 1CL, Sarafin had to descend 14 steps to a cement

pad below ground level as depicted in the following photograph:



He then had to climb six steps to reach the sidewalk at street level, as depicted in

the following photograph:



21.     By 2020, Sarafin required the use of a rollator walker, depicted in following photograph, to travel short distance on foot:



But Sarafin could not exit Apartment 1CL with his walker unless a companion,

typically his wife Kunia, carried the walker to the sidewalk at street level.

22.     For true mobility, Sarafin required use of an electric wheelchair, which his doctor prescribed in 2020.  While a resident of Apartment 1CL, it was infeasible for Sarafin and his wife Kunia to lug the electric wheelchair from their apartment to the sidewalk where it could be used by Sarafin.

### C. Sarafin's Requests for Reasonable Accommodation

23.     Sarafin's Apartment 1CL in the Puahala Homes IV project is assigned to HPHA's AMP 31 along with six other state and federal low-income housing projects.  The AMP 31 manager during Sarafin's tenancy was Julie Wiggett ("Wiggett").  In 2020, Sarafin tried on several occasions to communicate to Wiggett about his need to transfer to a more accessible apartment because of his disabilities.  But Wiggett does not speak Chuukese, Sarafin's primary language.  And Wiggett failed to offer interpretation services to Sarafin.

24.     On March 4, 2021, Sarafin submitted a written request for an accessible apartment using HPHA's Reasonable Accommodation/Modification Request Form.  Because of Sarafin's limited ability to speak and write in English, the form was completed with the help of an English speaker.   The form specified that Sarafin requested an apartment "that has scooter access (ground floor or unit with elevator)."   It indicated that Sarafin was limited in his ability to walk due to disabilities and identified Ruth Chong as a medical provider who could verify Sarafin's need for the accommodation.  It also stated that Sarafin needed a Chuukese interpreter to discuss his request.

25.     HPHA staff also completed part of the form submitted by Sarafin in March.  In the section labeled "official use only," HPHA staff indicated that the

relationship between Sarafin's disability and his request to transfer to an accessible apartment was "obvious or readily known" to HPHA's managers.

26.     When HPHA failed to respond to his request by July, Sarafin asked Ruth Chong, his Family Nurse Practitioner, for help.  Writing in English, Chong completed a second Reasonable Accommodation/ Modification Request Form for Sarafin, which was submitted to HPHA on July 9, 2021.  As before, the form indicated that Sarafin was limited in his ability to walk due to disabilities and identified Chong as a medical provider who could verify Sarafin's need for the accommodation.  It added information to underscore the urgency of the request:

> Mr. Sarafin has a motorized wheelchair due to disability and needs a ground floor apartment. Mr. Sarafin is not currently able to access his apartment using his wheelchair.

Chong also wrote, signed, and submitted along with HPHA request form a verification of Sarafin's need for the accommodation:

> I am writing on behalf of Sarafin, Sinisio, who is a patient at KKV clinic. Mr. Sarafin is physically disabled due to chronic severe back pain related to lumbar stenosis and chronic bilateral knee pain with osteoarthritis. His lumbar spinal stenosis and lumbar degenerative disc disease was visualized by MRI of the lumbar spine on 5/07/12 and 7/12/18. He currently has limited range of motion to spine and difficulty walking noted during clinic follow up visits.  Mr. Sarafin requires better accommodations due to his physical condition. He needs either a 2 bedroom ground floor apartment or an apartment with elevator access to be able to operate his motorized wheelchair.

Chong also repeated Sarafin's prior request for a Chuukese interpreter to discuss his reasonable accommodation.

27.    HPHA's internal records show that at least one manager assigned to Sarafin's complex took action.  On July 29, 2021, Ludwig Gonzales, an HPHA employee assigned to AMP 31, faxed Sarafin's written request and Chong's medical verification to HPHA's Compliance Office, marking the fax as "urgent" and "please reply."

28.    When HPHA failed to respond to Sarafin's second request by November, Melissa McKinney, Sarafin's doctor, submitted to HPHA on November 29, 2021, her own verification of Sarafin's need for the accommodation:

> Patient suffers from disabling conditions including spinal stenosis, osteoarthritis in his knees, COPD, asthma and heart problems. He is seeing multiple specialists for his care. I recommend that he have first-floor housing due to these medical conditions.

29.    When HPHA failed to respond to McKinney's verification by February 2022, McKinney resubmitted her medical verification to HPHA on February 24, 2022.

30.    By 2023, Sarafin remained stuck in Apartment 1CL and felt hopeless. With the help and support of his doctors, he had submitted two written requests to HPHA asking for an accessible apartment and provided several medical verifications in support of his accommodation.   After waiting more than two years for HPHA to act, Sarafin contacted LASH in May 2023 for help.

31.    LASH promptly renewed Sarafin's reasonable accommodation

request for a transfer to an accessible apartment.   When HPHA continued to
refuse to act, LASH convened meetings with HPHA in June and July.  In July
LASH met with Ouansafi, Akamine, and a HUD representative to discuss HPHA's
refusal to take timely action in response to the requests for reasonable
accommodation by Sarafin and other LASH clients.  Ouansafi and Akamine
asserted to LASH and HUD that as July 2023, HPHA had resolved any backlog of
outstanding requests for reasonable accommodation.   But neither Ouansafi nor
Akamine offered an explanation for HPHA's failure to act on Sarafin's request.
LASH followed that meeting with further correspondence to Ouansafi, but
received no response.

33. Meanwhile, Sarafin remained trapped in Apartment ICL.  In October
HPHA finally advised Sarafin and LASH that it would transfer Sarafin to a new
apartment – one that was substantially less accessible than Apartment ICL.

**D.    HPHA Transfers Sarafin to a Less Accessible Dwelling**

33. On October 17, 2023, Wiggett sent Sarafin a letter, stating that within
eight days he would be transferred from his home to Apartment 15A at Puahala
Homes, located at 1112-A Ahiahi Street. The letter said nothing about Sarafin's
requests for a reasonable accommodation; instead it ordered:

> Per your rental agreement you will be transferred to the correct unit for your
> household. Management has identified an appropriate size unit in Puahala
> Homes at 1112-A Ahiahi Street 15A, Honolulu, Hawai'i 96817.
>
> . . . .
>
> The tentative move date will be for Wednesday, October 25, 2023. A mover
> will be hired to move your belongings.

34.     Sarafin contacted LASH for help.  He lacked the ability to readily exit Apartment 1CL, let alone move his household to another apartment in eight days. Wiggett's letter was silent about Sarafin's need for an accessible apartment and he worried that Apartment 15A posed the same accessibility problems as Apartment ICL.

35.     LASH inspected the exterior of Apartment 15A.  That inspection revealed that Apartment 15A was much less accessible than Apartment 1CL, and dangerously so.

36.     The red box in following photograph depicts the location of Apartment 15A:



To exist or access Apartment 15A, Sarafin must navigate two sets of concrete stairs, as depicted in the following photograph:



Alternatively,  Sarafin can try to navigate the concrete stairs from Apartment 15A to a concrete walkway and then follow that walkway to a median, where he must traverse an unimproved dirt patch to reach a steep roadway, as depicted in the following photograph:



37.     Sarafin faced a choice:   He could move his family to Apartment 15A or refuse to move and risk eviction by HPHA rendering his family homeless. Akamine agreed to give Sarafin until November 14 to transfer to Apartment 15A, but steadfastly refused to tell Sarafin or LASH whether HPHA would ever act on Sarafin's request for an accessible apartment.

38.     Since November 14, 2023, Sarafin has occupied Apartment 15A.

**E.     Defendants Have Engaged in a Pattern of Deliberate Indifference to Sarafin and Other Tenants' Federal and State Fair Housing Rights.**

39.     HPHA, Ouansafi, and Akamine's treatment of Sarafin are the most recent acts of deliberate indifference in a pattern of disability discrimination by HPHA that spans more than a decade.

40.     In 2011, HPHA settled *McMillon v. State of Hawaii*, a federal class action filed by disabled tenants who occupied apartments at HPHA's Kuhio Park Terrace and Kuhio Homes.   As here, the tenants alleged that HPHA violated the ADA, Rehabilitation Act, and Fair Housing Act by engaging in disability discrimination. To resolve that lawsuit, HPHA executed a settlement agreement compelling HPHA, among other things:

a.     to improve its procedure and establish deadlines for acting upon requests for reasonable accommodations, including transfers by disabled residents to accessible apartments; and,

b.     to modify the premises to improve their accessibility for tenants with limited mobility.

41.     In 2012, HUD declared HPHA to be a "troubled" PHA, its lowest score under the Public Housing Assessment System. As a result, HUD compelled

HPHA to execute a binding Memorandum of Agreement mandating that it undertake specific corrective actions to improve its compliance with the statutes and regulation that bind HPHA pursuant to its Annual Contributions Contracts.

42.    In 2018, HPHA executed a Voluntary Compliance Agreement with HUD to settle complaints in HUD Case 09-16-0001-4 alleging that HPHA continued to  discriminate against persons with disabilities in violation of the Rehabilitation Act.   This agreement applied to any housing – state or federal – operated by HPHA.   It bound HPHA between 2018 and 2021:

a.    to employ an accessibility consultant to perform a Needs Assessments, Accessibility Assessments/Surveys, Self-Evaluations, and Transition Plans to meet the needs of HPHA's disabled tenants;

b.    to assess the needs for accessible units by HPHA's current and waiting list tenants and document that HPHA is engaged in the maximum utilization of accessible units for tenants who need them;

c.    to complete an Accessibility Surveys of all units designated as accessible by HPHA to identify any physical barriers to persons with mobility impairments and remove them; and,

d.    to implement the findings of the accessibility consultant that HPHA was required to employ.

43.    HUD also required that the Compliance Agreement include other provisions relevant in this action:

a.    HPHA is "reminded of their limited English proficient (LEP) obligations under Title VI of the Civil Rights Act of 1964 as clarified in the Federal Register on January 22, 2007 (72 FR 2731-2754)."   Specifically,

-17-

HPHA is "required to make reasonable efforts to provide language assistance to ensure meaningful access for LEP persons to Recipients' programs and activities"; and,

b.     HPHA is "reminded that any repositioning efforts undertaken (demolition, redevelopment under choice neighborhood implementation grants, mixed finance or other programs, etc.) are required to meet the applicable accessibility standards along with meeting the accessibility and disability related needs for existing program participants (i.e., reasonable accommodations)."

44.     Ouansafi executed the Compliance Agreement in HUD Case 09-16-0001-4 on behalf of HPHA.

45.     Since expiration of that Compliance Agreement in 2021, HPHA continues to violate the civil rights of tenants with disabilities.   Between 2021 and 2023, for example, 29 persons with disabilities have complained to LASH regarding HPHA's failure or refusal to act on their requests for reasonable accommodations or modifications.

46.     Sarafin's case is an extreme but not an unusual example of Defendants' deliberate indifference.  Following LASH's conference on July 5, 2023, with Ouansafi, Akamine, and a HUD representative, Akamine wrote LASH asserting that Sarafin had never made the requests for a reasonable accommodation, listed in this complaint (and copied from HPHA's own files). Akamine also asserted that HPHA had granted Sarafin's request for transfer to an accessible apartment in August 2021 (though no such action is reflected in HPHA's files).  Regardless of the veracity of Akamine's assertions, Sarafin

remains trapped in ever more inaccessible HPHA housing.

### F.  HPHA Injured Plaintiffs Entitling Them to Relief

47.    As a result of the unlawful housing practices alleged herein, Defendants injured Sarafin causing him personal injuries, emotional distress, humiliation, embarrassment, stress, and attendant bodily injuries.  Sarafin also suffered violation of his federal civil rights and loss of important housing opportunities. Accordingly, Sarafin is entitled to compensatory damages to the full extent permitted under his claims, subject to defenses and immunities.

48.    Defendants Hakim Ouansafi and Ryan Akamine, and each of them, acted with – or knowingly ratified or condoned actions that demonstrate – deliberate indifference to Sarafin's federal and state civil rights.  Accordingly, Sarafin is entitled to punitive damages against Ouansafi and Akamine, personally, to the full extent permitted under his claims, subject to Ouansafi and Akamine's defenses and immunities.

49.    As a result of the unlawful housing practices alleged herein, Defendants injured LASH forcing it to divert its limited resources to counteract Defendants' unlawful housing practices and thereby frustrating LASH's mission. As a result, LASH seeks prospective, equitable relief only enjoining Defendants' unlawful practice and ordering Defendants' to undertake affirmative steps to counteract the effects of their unlawful practice.

50.    There now exists an actual controversy between the parties regarding Defendants' duties under federal and state civil rights laws.  Accordingly, Sarafin and LASH are entitled to declaratory relief under federal laws including, but not limited to, 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure.

51.     Unless enjoined, Defendants will continue to engage in the unlawful housing practices alleged in this complaint.  Neither Sarafin nor LASH has a complete remedy at law and suffers and will continue to suffer irreparable injury unless Defendants, and each of them, are enjoined. Accordingly, Sarafin and LASH are entitled to injunctive relief under their federal claims including, but not limited to, 28 U.S.C. § 2202 and Rule 65 of the Federal Rules of Civil Procedure.

## VI. CLAIMS FOR RELIEF

### A.  First Claim: Fair Housing Act

52.     Plaintiffs reallege and incorporate by reference each preceding paragraph.

53.     Each HPHA low-income housing project are "dwellings" under the Fair Housing Act, 42 U.S.C. § 3602(b).

54.     Sarafin is a person with handicaps within the meaning of 42 U.S.C. § 3602(f).   As a Limited English Proficient person, Sarafin is also protected from discrimination on the basis of national origin under federal Fair Housing Act.

55.     Defendants Hakim Ouansafi and Ryan Akamine, in their official and personal capacities, are liable for the commission of following discriminatory housing practices, 42 U.S.C. § 3602(b), in violation of the federal Fair Housing Act[2]:

a.      42 U.S.C. § 3604(f)(1), by restricting or denying housing opportunities or other otherwise making dwellings unavailable because of disability or national origin, including:

_____

[2]Under the 11th Amendment, HPHA, an arm of the State of Hawai'i, is not named as a Defendant under the federal Fair Housing Act.

I.      Enacting or implementing policies or requirements that restrict or deny housing opportunities or otherwise make unavailable or deny dwellings to persons because of disability or national origin, 24 C.F.R. § 100.70(d)(5);

ii.     Restricting or attempting to restrict the choices of a person by word or conduct in connection with seeking, negotiating for, or renting a dwelling because of disability or national origin, 24 C.F.R. § 100.70(a);

iii.    Discouraging any person from inspecting or renting a dwelling because of disability or national origin, 24 C.F.R. § 100.70(c)(1);

iv.     Communicating to any prospective renter that he or she would not be comfortable or compatible with existing residents of a community because of disability or national origin, 24 C.F.R. § 100.70(c)(3); and,

v.      Excluding any person from a particular section of a community or neighborhood because of disability or national origin, 24 C.F.R. § 100.70(c)(3).

b.      42 U.S.C. § 3604(f)(2), by imposing different terms and conditions on the rental or occupancy of a dwelling based on disability or national origin, including:

I.      Engaging in any conduct relating to the provision of housing or of services and facilities in connection therewith that otherwise makes unavailable or denies dwellings to persons because of disability or national origin, 24 C.F.R. § 100.70(b); and,

ii.     Limiting the use of privileges, services or facilities associated with a dwelling because of disability or national origin of an owner, tenant or a person associated with him or her, 24 C.F.R. § 100.65(b)(4).

c.     42 U.S.C. § 3604(c), by stating, printing or publishing a limitation based on disability or national origin regarding rental or occupancy of dwellings, including using words, phrases, symbols or forms which convey that dwellings are not available to a particular group of persons because of disability or national origin, 24 C.F.R. § 100.75(c)(1);

d.     42 U.S.C. § 3604(f)(3)(B), by refusing to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford a handicapped person equal opportunity to use and enjoy a dwelling unit, including public and common use areas.

e.     42 U.S.C. § 3617, by interfering with the exercise or enjoyment of federal fair housing rights, including:

I.     Coercing a person, either orally, in writing, or by other means, to deny or limit the benefits provided that person in connection with the rental of a dwelling because of disability or national origin, 24 C.F.R. § 100.400(c)(1); and,

ii.     Threatening, intimidating, or interfering with persons in their enjoyment of a dwelling because of the disability or national origin of such persons or of associates of such persons, 24 C.F.R. § 100.400(c)(2).

56.    In committing one or more of the discriminatory practices listed under this claim, Ouansafi and Akamine acted with knowledge that harm to Plaintiffs' federally protected rights was substantially likely and failed to act upon that likelihood.

57.    Each Plaintiff was injured by one or more of the discriminatory housing practices listed under this claim; accordingly, each Plaintiff is an "aggrieved person," 42 U.S.C. § 3602(I), entitled to relief, 42 U.S.C. § 3613.

### B.  Second Claim:  Americans with Disabilities Act

58.    Plaintiffs reallege and incorporate by reference each preceding paragraph.

59.    Defendant HPHA is a "public entity," subject to Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131(1)(b), and responsible for ADA violations committed by its employees and officials.

60.    Sarafin is a qualified individual with a disability, 42 U.S.C. § 12131(2); LASH is an entity known to have a relationship or associations with disabled persons, 42 U.S.C. § 12134, 28 C.F.R. § 35.130(g).

61.    Defendant HPHA and Defendants Hakim Ouansafi and Ryan Akamine, in their official and personal capacities, are liable for the commission of the following discriminatory practices in violation of the ADA:

a.    Denying a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service, 28 C.F.R. § 35.130(b)(1)(I);

b.    Affording a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to

that afforded others,  28 C.F.R. § 35.130(b)(1)(ii);

c.      Providing a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others, 28 C.F.R. § 35.130(b)(1)(iii);

d.      Providing different or separate aids, benefits, or services to individuals with disabilities or to any class of individuals with disabilities than is provided to others unless such action is necessary to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others, 28 C.F.R. § 35.130(b)(1)(iv);

e.      Denying a qualified individual with a disability the opportunity to participate in services, programs, or activities that are not separate or different, despite the existence of permissibly separate or different programs or activities, 28 C.F.R. § 35.130(b)(2);

f.       Utilizing criteria or methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; and have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities, 28 C.F.R. § 35.130(b)(3);

g.       Selecting dwelling units for a qualified individual with a disability that have the effect of excluding individuals with disabilities from, denying them the benefits of, or otherwise subjecting them to discrimination; or that have the purpose or effect of defeating or substantially impairing the

accomplishment of the objectives of the service, program, or activity with respect to individuals with disabilities, 28 C.F.R. § 35.130(b)(4);

h.     Failing or refusing to make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, 28 C.F.R. § 35.130(b)(7); and,

I.      Imposing or applying eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, 28 C.F.R. § 35.130(b)(8).

62.     In committing one or more of the discriminatory practices listed under this claim, Defendants, and each of them, acted with knowledge that harm to Plaintiffs' federally protected rights was substantially likely and failed to act upon that likelihood.

63.     Each Defendant injured each Plaintiff by committing one or more of the discriminatory practices listed under this claim; accordingly, each Plaintiff is a "person aggrieved" and entitled to relief, 42 U.S.C. § 12133.

### C.  Third Claim: Title VI

64.     Plaintiffs reallege and incorporate by reference each preceding paragraph.

65.     Defendant HPHA is a "recipient of federal financial assistance," subject to Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d, 2000d-4a.

66.     Sarafin is a Limited English Proficient person protected from discrimination on the basis of national origin under Title VI of the Civil Rights Act of 1964 pursuant to Executive Order 13166, as implemented by HUD, 72

Fed.Reg. 2732-54 (Jan. 22, 2007).

67.    Defendant HPHA and Defendants Hakim Ouansafi and Ryan Akamine, in their official and personal capacities, are liable for the commission of the following discriminatory practices because of national original  in violation of the Title VI:

a.    Denying a person any housing, accommodations, facilities, services, financial aid, or other benefits provided under the program or activity, 24 C.F.R. § 1.4(b)(1)(I);

b.    Providing any housing, accommodations, facilities, services, financial aid, or other benefits to a person which are different, or are provided in a different manner, from those provided to others under the program or activity, 24 C.F.R. § 1.4(b)(1)(ii);

c.    Subjecting a person to segregation or separate treatment in any matter related to his receipt of housing, accommodations, facilities, services, financial aid, or other benefits under the program or activity, 24 C.F.R. § 1.4(b)(1)(iii);

d.    Restricting a person in any way in access to such housing, accommodations, facilities, services, financial aid, or other benefits, or in the enjoyment of any advantage or privilege enjoyed by others in connection with such housing, accommodations, facilities, services, financial aid, or other benefits under the program or activity, 24 C.F.R. § 1.4(b)(1)(iv);

e.    Treating a person differently from others in determining whether he satisfies any occupancy, admission, enrollment, eligibility, membership, or other requirement or condition which persons must meet in order to be

provided any housing, accommodations, facilities, services, financial aid, or other benefits provided under the program or activity, 24 C.F.R. § 1.4(b)(1)(v);

f.      Denying a person opportunity to participate in the program or activity through the provision of services or otherwise, or afford him an opportunity to do so which is different from that afforded others under the program or activity, 24 C.F.R. § 1.4(b)(1)(vi);

g.      Utilizing criteria or methods of administration which have the effect of subjecting persons to discrimination because of their national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program or activity as respect to persons of a particular national origin, 24 C.F.R. § 1.4(b)(2);

h.      Making selections with the purpose or effect of excluding individuals from, denying them the benefits of, or subjecting them to discrimination under any program to which this part 1 applies, on the ground of national origin; or with the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of Title VI or HUD's regulations promulgated pursuant thereto, 24 C.F.R. § 1.4(b)(3);

I.      Failing or refusing to administer HPHA's programs to take affirmative action to overcome the effects of conditions which resulted in limiting participation by persons of a particular national origin, 24 C.F.R. § 1.4(b)(6)(ii).

68.     In committing one or more of the discriminatory practices listed under this claim, Defendants, and each of them, acted with knowledge that harm to

Plaintiffs' federally protected rights was substantially likely and failed to act upon that likelihood.

69.　　Each Defendant injured each Plaintiff by committing one or more of the discriminatory practices listed under this claim; accordingly, each Plaintiff is entitled to relief, 42 U.S.C. § 2000d-7.

### D.   Fourth  Claim: Rehabilitation Act

70.　　Plaintiffs reallege and incorporate by reference each preceding paragraph.

91.　　Defendant HPHA is a "recipient of federal financial assistance," subject to Rehabilitation Act, 29 U.S.C. 749.

72.　　Sarafin is an individual with a disability and an otherwise qualified individual with handicaps under the Rehabilitation Act, 29 U.S.C. § 705.

73.　　Defendant HPHA and Defendants Hakim Ouansafi and Ryan Akamine, in their official and personal capacities, are liable for the commission of the following discriminatory practices because of disability in violation of the Rehabilitation Act:

a.　　Denying a qualified individual with handicaps the opportunity to participate in, or benefit from, the housing, aid, benefit, or service, 24 C.F.R. § 8.4(b)(1)(I);

b.　　Affording a qualified individual with handicaps an opportunity to participate in, or benefit from, the housing, aid, benefit, or service that is not equal to that afforded to others, 24 C.F.R. § 8.4(b)(1)(ii);

c.　　Providing a qualified individual with handicaps with any housing, aid, benefit, or service that is not as effective in affording the individual an

equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others, 24 C.F.R. § 8.4(b)(1)(iii);

d.      Providing different or separate housing, aid, benefits, or services to individuals with handicaps or to any class of individuals with handicaps from that provided to others unless such action is necessary to provide qualified individuals with handicaps with housing, aid, benefits, or services that are as effective as those provided to others, 24 C.F.R. § 8.4(b)(1)(iv);

e.      Otherwise limiting a qualified individual with handicaps in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by other qualified individuals receiving the housing, aid, benefit, or service, 24 C.F.R. § 8.4(b)(1)(viii);

f.      Failing or refusing to afford individuals with handicaps equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement, 24 C.F.R. § 8.4(b)(2);

g.      Denying a qualified individual with handicaps the opportunity to participate in any federally assisted program or activity that is not separate or different despite the existence of permissibly separate or different programs or activities, 24 C.F.R. § 8.4(b)(3);

h.      Utilizing criteria or methods of administration the purpose or effect of which would:  (I) Subject qualified individuals with handicaps to discrimination solely on the basis of handicap; (ii) Defeat or substantially impair the accomplishment of the objectives of the recipient's federally assisted program or activity for qualified individuals with a particular

handicap involved in the program or activity, or (iii) Perpetuate the discrimination of another recipient if both recipients are subject to common administrative control or are agencies of the same State, 24 C.F.R. § 8.4(b)(4);

I.      Failing or refusing to operate existing low-income housing in accordance with accessibility requirements, 24 C.F.R. § 8.24(a);

j.      Failing or refusing to operate existing low-income housing in accordance with a valid needs assessment and transition plan, 24 C.F.R. § 8.25(c); and,

k.      Failing or refusing to operate existing low-income housing in accordance with occupancy of accessibility requirements, 24 C.F.R. § 7.27.

74.    In committing one or more of the discriminatory practices listed under this claim, Defendants, and each of them, acted with knowledge that harm to Plaintiffs' federally protected rights was substantially likely and failed to act upon that likelihood.

75.    Each Defendant injured each Plaintiff by committing one or more of the discriminatory practices listed under this claim; accordingly, each Plaintiff is entitled to relief, 29 U.S.C.A. § 794a(a)(2).

### E.  Fifth Claim: Hawai'i Fair Housing Act

76.    Plaintiffs reallege and incorporate by reference each preceding paragraph.

77.    Each HPHA low-income housing project is a "housing accommodation" under Hawai'i's fair housing statute, HRS § 515-2; HPHA and its employees are subject to Hawai'i's fair housing statutes, HRC Chapter HRS §

356D-7 ("Notwithstanding any law to the contrary, chapter 515 shall apply in administering this chapter").

78.   Sarafin is a person with a disability within the meaning of HRS § 515-2.   As a Limited English Proficient person, Sarafin is also protected from discrimination on the basis of national origin under HRS Chapter 515.

79.   Defendants HPHA, Hakim Ouansafi, and Ryan Akamine are liable for the commission of following discriminatory practices, HRS § 515-2, based on disability or national origin in violation of the Hawai'i's fair housing statute:

a.   Each discriminatory housing practice alleged under the First Claim for violation of the federal Fair Housing Act, HAR § 12-46-301;

b.   To institute or apply facially neutral policies or restrictions which result in a disparate adverse impact, HAR § 12-46-305(8);

c.   To discriminate in the terms, conditions, enjoyment, or privileges of a real estate transaction, or in the furnishing of facilities or services in connection therewith, HAR § 12-46-305(2);

d.   To aid, abet, incite, or coerce a person to engage in a discriminatory practice, HAR § 12-46-310(2);

e.   To interfere with persons in their enjoyment of a housing accommodation, or visitors or associates of such persons, because of the person's protected basis, HAR § 12-46-310(6); and,

f.   Refusing to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford a person with a disability equal opportunity to use and enjoy a housing accommodation, including public and common use areas, HAR §

12-46-306(a)(3).

80.     In committing one or more of the discriminatory practices listed under this claim, each Defendant acted in a manner that entitles Sarafin to damages, including punitive damages, and each is responsible for the violations committed by the others.

81.     Each Defendant injured each Plaintiff by committing one or more of the discriminatory practices listed under this claim; accordingly, each Plaintiff is entitled to relief, § 515-9(b) & (c).

### F.  Sixth Claim:  HRS § 368-1

82.     Plaintiffs reallege and incorporate by reference each preceding paragraph.

83.     Defendant HPHA is a "recipient of state financial assistance," subject to HRS §§ 368-1, 368-1.5; it is also a "covered entity," subject to HRS § 321C-2.

84.     Sarafin is a Limited English Proficient person protected from discrimination on the basis of national origin under HRS §§ 368-1, 368-1.5, and Chapter 321C; he is also an individual with a disability and an otherwise qualified individual with disabilities under HRS Chapter 368.

85.     Defendants HPHA, Hakim Ouansafi, and Ryan Akamine, are liable for commission of each of the following discriminatory practices because of national original in  HRS §§ 368-1, 368-1.5, and HRS Chapter 321C:

a.     Denying a person any housing, accommodations, facilities, services, financial aid, or other benefits provided under the program or activity;

b.     Providing any housing, accommodations, facilities, services, financial aid, or other benefits to a person which are different, or are provided in a

different manner, from those provided to others under the program or activity;

c.      Subjecting a person to segregation or separate treatment in any matter related to his receipt of housing, accommodations, facilities, services, financial aid, or other benefits under the program or activity;

d.      Restricting a person in any way in access to such housing, accommodations, facilities, services, financial aid, or other benefits, or in the enjoyment of any advantage or privilege enjoyed by others in connection with such housing, accommodations, facilities, services, financial aid, or other benefits under the program or activity;

e.      Treating a person differently from others in determining whether he satisfies any occupancy, admission, enrollment, eligibility, membership, or other requirement or condition which persons must meet in order to be provided any housing, accommodations, facilities, services, financial aid, or other benefits provided under the program or activity;

f.      Denying a person opportunity to participate in the program or activity through the provision of services or otherwise, or afford him an opportunity to do so which is different from that afforded others under the program or activity;

g.      Utilizing criteria or methods of administration which have the effect of subjecting persons to discrimination because of their national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program or activity as respect to persons of a particular national origin; and,

-33-

h.     Making selections with the purpose or effect of excluding individuals from, denying them the benefits of, or subjecting them to discrimination under any program on the ground of national origin; or with the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of HRS §§ 368-1, 368-1.5, and Chapter 321C.

86.     In committing one or more of the discriminatory practices listed under this claim, each Defendant acted in a manner that entitles Sarafin to damages, including punitive damages, and each is responsible for the violations committed by the others.

87.     Each Defendant injured each Plaintiff by committing one or more of the discriminatory practices listed under this claim; accordingly, each Plaintiff is entitled to relief to the full extent provided under HRS.

## V.  PRAYER FOR RELIEF

88.     Accordingly, each Plaintiff seeks entry of a judgment that:

a..     Declares the rights and responsibilities of the parties;

b.     Enjoins Defendants, and each of them, for discriminating on the basis of disability or national origin, including Limited English Proficiency;

c.     Compels Defendants, and each of them, to undertake affirmative steps to correct their discriminatory practice and counteract the effects of their discriminatory practices;

d.     Awards compensatory damages to Sarafin to the full extent of the law;

e.     Awards punitive damages to Sarafin to the full extent of the law;

f.     Awards attorneys' fees, costs, and expenses to each Plaintiff; and,

g.      Grants all such additional relief to which Plaintiff is entitled.

* * *

Dated: February 10, 2024.

Respectfully submitted,

LEGAL AID SOCIETY OF
HAWAIʻI

*/s/ Nicholas Severson*
Nicholas Severson
nicholas.severson@legalaidHawaiʻi.org
Cynthia Moore
cynthia.moore@legalaidHawaiʻi.org
Morgan Sasaki
morgan.sasaki@legalaidHawaiʻi.org
924 Bethel Street
Honolulu, HI 96813
Tel:  (808) 527-8039

Attorneys for Plaintiffs Sinisio Sarafin and Legal Aid Society of Hawaiʻi