UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| SINISIO SARAFIN, LEGAL AID SOCIETY OF HAWAI`I,<br><br>        Plaintiffs,<br><br>    vs.<br><br>HAWAI`I PUBLIC HOUSING AUTHORITY, HAKIM OUANSAFI, RYAN AKAMINE,<br><br>        Defendants. | CIV. NO. 24-00066 LEK-WRP |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT
AND DENYING PLAINTIFFS' REQUESTS FOR JUDICIAL NOTICE**

On May 6, 2024, Defendants Hawai`i Public Housing

Authority ("HPHA"), Hakim Ouansafi ("Ouansafi"), and Ryan

Akamine ("Akamine" and collectively "Defendants") filed their

Motion to Dismiss Plaintiff's First Amended Complaint

("Motion"). [Dkt. no. 26.] Plaintiffs Sinisio Sarafin

("Sarafin") and Legal Aid Society of Hawai`i ("LASH" and

collectively "Plaintiffs") filed their memorandum in opposition

on June 3, 2024, and Defendants filed their reply on June 10,

2024. [Dkt. nos. 29, 33.] This matter came on for hearing on

June 24, 2024. At this Court's direction,[1] Plaintiffs filed a

---

[1] On October 3, 2024, this Court issued an entering order ordering the filing of supplemental memoranda. [Minute Order – EO: Court Order Directing the Parties to File Supplemental

(. . . continued)

supplemental memorandum on October 17, 2024, and Defendants filed their supplemental memorandum October 31, 2024. [Dkt. nos. 45, 46.]

Defendants' Motion is hereby granted in part and denied in part for the reasons set forth below. The Motion is granted insofar as LASH's claims are dismissed without prejudice and insofar as some of Sarafin's claims, identified specifically below, are dismissed without prejudice. The Motion is denied in all other respects. In addition, Plaintiffs' requests for judicial notice, filed on June 3, 2024 and June 17, 2024, [dkt. nos. 30, 36,] are denied. Plaintiffs are granted leave to file a second amended complaint by **January 29, 2025.**

<u>BACKGROUND</u>

Sarafin was born in Chuuk, Federated States of Micronesia. He immigrated to O`ahu in 2005. Chuukese is Sarafin's primary language. [First Amended Complaint, filed 4/22/24 (dkt. no. 24) ("Amended Complaint"), at ¶ 17.] When the Amended Complaint was filed, Sarafin was seventy-four years old. [<u>Id.</u> at ¶ 4.] He "suffers from a variety of physical impairments that substantially limit his mobility." [<u>Id.</u>] Plaintiffs therefore allege he is a qualified person with disabilities for purposes of the Fair Housing Act ("FHA"), Title 42 United States

---

Memoranda Addressing Recent Decisions Regarding Organizational Standing, 10/3/24 (dkt. no. 43) ("10/3 EO").]

Code Section 3602(h); the Americans with Disabilities Act

("ADA"), Title 42 United States Code Section 12131(2); and the

Rehabilitation Act, Title 29 United States Code Section 794.

[Id.] They also allege Sarafin is a person with Limited English

Proficiency ("LEP") for purposes of Section 601 of Title VI of

the Civil Rights Act of 1964 ("Title VI"), Title 42 United

States Code Section 2000d-1. [Id.]

　　　　In May 2019, Safin and his family were approved to

move into Apartment 1CL of the Puahala Homes IV complex

("Apartment 1CL"). The Puahala Homes IV complex is a low-income

housing project operated by HPHA.[2] [Id. at ¶ 19.] However,

Sarafin's disabilities made it difficult for him to access

Apartment 1CL because there is a set of stairs from his unit to

the ground level and another set of stairs from the ground level

to the sidewalk. [Id. at ¶¶ 20-21.]

　　　　By 2020, Sarafin had to use a rollator walker for

walking short distances. Someone, usually Sarafin's wife, had to

carry the walker up and down the stairs for Sarafin whenever

Sarafin left the apartment. [Id. at ¶¶ 22-23.] Some time in

2020, Sarafin's doctor prescribed him an electric wheelchair,

---

[2] Plaintiffs allege HPHA operates eighty-five public housing
projects in Hawai`i. These are organized into seventeen Asset
Management Projects ("AMP"). [Amended Complaint at ¶ 10.]
Puahala Homes IV and six other federal and state low-income
housing projects are part of AMP 31. [Id. at ¶ 25.]

which Sarafin states was necessary for him to have "true mobility." [Id. at ¶ 24.] However, it was not feasible for him to use the electric wheelchair while he was living at Apartment 1CL. On several occasions in 2020, Sarafin attempted to speak to Julie Wiggett, the AMP 31 manager ("Wiggett"), about his need to transfer to a more accessible apartment. [Id. at ¶¶ 24-25.] Chuukese is Sarafin's primary language, [id. at ¶ 17,] and Wiggett did not speak Chuukese, nor did Wiggett offer to arrange for interpretation services, [id. at ¶ 25].

On March 4, 2021, Sarafin submitted an HPHA Reasonable Accommodation/Modification Request ("RAR") Form, which he completed with the help of an English speaker. Because of his limited ability to walk and his need to use a scooter, Sarafin asked for an apartment that was either on the ground floor or has an elevator. He also stated a Chuukese interpreter was necessary to discuss the request. [Id. at ¶ 26.] At some point in March 2021, HPHA staff noted on the form that "the relationship between Sarafin's disability and his request to transfer to an accessible apartment was 'obvious or readily known' to HPHA's managers." [Id. at ¶ 27.]

By July 2021, because Sarafin had not received a response to the request, he had Ruth Chong ("Chong"), his Family Nurse Practitioner compete a second request form. In addition to the information included in the March request, the July request

4

included a verification of Sarafin's need to for an accommodation because of his physical disabilities. It also stated that Sarafin was not able to use his wheelchair to access Apartment 1CL. See id. at ¶ 28. On July 29, 2021, Ludwig Gonzales, an HPHA employee, faxed Sarafin's request and Chong's verification to the HPHA Compliance Office. [Id. at ¶ 29.] The fax was marked "urgent" and "please reply," but HPHA did not act upon the request. [Id.]

By November 2021, HPHA had not requested to Sarafin's requests. On November 29, 2021, Sarafin's doctor, Melissa McKinney, submitted a verification of Sarafin's need for an accommodation. Dr. McKinney resubmitted her verification on February 24, 2022 because there had been no action taken on Sarafin's request. [Id. at ¶¶ 30-31.]

Sarafin was still in Apartment 1CL in 2023, and he contacted LASH for help in May 2023. [Id. at ¶ 32.] Plaintiffs state LASH is "Hawai`i's oldest and largest nonprofit law firm. It engages in legal advocacy, outreach, and education throughout the state to provide access to justice to those from disadvantaged backgrounds." [Id. at ¶ 5.] By the time LASH began working on Sarafin's case, LASH had already

> diverted significant amount of its limited
> resources to meet and confer with HPHA, Ouansafi,
> and Akamine to address HPHA's failure or refusal
> to grant — or even acknowledge — requests for
> reasonable accommodations and modifications made

> by LASH's disabled clients, difficulty
> communicating with HPHA caseworkers, and alleged
> retaliation.[3] In order to create a dialogue to
> address these issues, LASH proposed monthly
> meetings with HPHA facilitated by HUD.

[Id. at ¶ 33.] The first such meeting occurred on August 24, 2021, and LASH would bring individual complaints to Ouansafi's attention between meetings. Later, LASH would also bring individual complaints to Akamine's attention. According to Plaintiffs, there was no improvement in the issues discussed at the meetings. See id.

After Sarafin sought LASH's assistance, LASH obtained Sarafin's HPHA tenant file and confirmed that he requested reasonable accommodations. LASH added Sarafin to the agenda of its next meeting with HPHA and the United States Department of Housing and Urban Development ("HUD"), which was scheduled for July 5, 2023. When the meeting took place, Ouansafi and Akamine only addressed broad concerns and would not discuss specific LASH clients. [Id. at ¶ 34.] On July 13, 2023, Akamine sent LASH and Ouansafi a written response to LASH's inquiry about Sarafin's requests. Akamine denied that there was an RAR from Sarafin submitted around either March 4, 2021 or July 2021. [Id. at ¶ 35.] However, Akamine also stated, "'Tenant Sarafin's

---

3 According to Plaintiffs, Ouansafi is HPHA's Executive Director. [Amended Complaint at ¶ 7.] Akamine is HPHA's Chief Compliance Officer and Section 504 Coordinator. [Id. at ¶ 8.]

July 19, 2021 request for ground floor unit (GFU) [was] submitted to Compliance on July 30, 2021. By mailed letter dated August 19, 2021, tenant was approved for GFU and handrails in the bathroom.'" [Id. (alteration in Amended Complaint).] Plaintiffs allege the August 19, 2021 letter that Akamine described was never provided to Sarafin. [Id. at ¶ 36.]

On July 25, 2023, LASH sent correspondence directly to Ouansafi, explaining Sarafin's circumstances and asking Ouansafi to address the mishandling of Sarafin's requests. Ouansafi did not respond. [Id. at ¶ 37.]

On or about October 16, 2023, Wiggett hand-delivered Sarafin a letter notifying him that he was being transferred to another apartment because the building where Apartment 1CL was located was being repurposed. The letter notifying Sarafin of the transfer did not mention his RARs. Plaintiffs assert the apartment that Sarafin was transferred to, Apartment 15A at Puahala Homes ("Apartment 15A"), was less accessible than Apartment 1CL. [Id. at ¶¶ 38-39.] Accessing Apartment 15A from street level involved either using two sets of stairs with more steps than Apartment 1CL or using one set of stairs and then crossing a dirt patch to a steep roadway. See id. at ¶ 41.

On October 20, 2023, LASH emailed Akamine, stating Apartment 15A was inaccessible to Sarafin and reiterating Sarafin's need for an accessible apartment because of his

7

disability-related needs. [Id. at ¶ 42.] Akamine responded the same day, acknowledging that the transfer was not related to Sarafin's RAR, and stating that Sarafin remained on an RAR waitlist. [Id. at ¶ 43.] On October 23, 2023, LASH emailed Akamine to inquire about the status of Sarafin's RARs, but Akamine did not respond. [Id. at ¶¶ 44-45.]

On October 24, 2023, LASH renewed its request for HPHA to place Sarafin in accessible housing. Akamine stated Sarafin was still on the RAR waitlist, and Akamine did not offer any alternatives, such as offering Sarafin a Housing Choice Voucher ("HCV"), which would allow Sarafin to look for accessible housing offered by a private landlord. Id. at ¶ 45; see also id. at ¶ 12 (describing HCVs). HPHA ultimately required Sarafin to choose between moving to Apartment 15A or losing his housing, with no opportunity to pursue a grievance. Sarafin moved to Apartment 15A on November 14, 2023, and was still living there at the time he filed the Amended Complaint. [Id. at ¶ 46.]

Plaintiffs allege Defendants' actions regarding Sarafin's RARs are part of a long-standing pattern of deliberate indifference to the rights of disabled tenants under federal and state fair housing laws. As evidence of the pattern, Plaintiffs cite the 2011 settlement of the McMillon v. Hawai`i class action, a 2012 Memorandum of Agreement between HPHA and HUD following a HUD assessment, and a 2018 Voluntary Compliance

8

Agreement between HPHA and HUD as part of a settlement of HUD complaints in HUD Case 09-16-0001-4. [Id. at ¶¶ 47-53.] Plaintiffs point out that the Voluntary Compliance Agreement expired in 2021, but Plaintiffs allege that, even when the compliance agreement was in place, "HPHA continue[d] to violate the civil rights of tenants with disabilities." [Id. at ¶ 53.] According to Plaintiffs, LASH received "numerous" complaints about HPHA's responses to RARs or modification requests. [Id.]

Plaintiffs also allege that, although HPHA has adopted a federally mandated Language Access Plan, HPHA did not comply with the plan's requirements in its communications with Sarafin. [Id. at ¶¶ 54-57.] Plaintiffs acknowledge that an October 17, 2023 letter from Wiggett to Sarafin included a HPHA LEP Disclosure Form with a phone number to call for interpretation services, but Plaintiffs argue this was "an anomaly." [Id. at ¶ 57.] Plaintiffs point out that, when HPHA provided Sarafian with his December 29, 2022 reexamination notice, it did not provide an LEP disclosure or any other information about interpretation services. In contrast, during the 2023 reexamination process, after LASH began advocating on Sarafin's behalf, HPHA did provide Sarafin with interpretative services. [Id. at ¶ 57 & n.3.] However, other times when Sarafin has attempted to use the interpretative services identified in the LEP notices, including as recently as March 19 2024, he was not

9

provided with the services. [Id. at ¶ 58.] Further, when
interpretative services have been provided, they have been
insufficient because they were not provided in the Chuukese
dialect that Sarafin speaks, and when an interpreter who spoke
the correct dialect was provided, the interpreter did not have
sufficient time for Sarafin to express his concerns to HPHA.
[Id. at ¶ 59.]

        Plaintiffs allege Defendants' unlawful actions have
required LASH to divert its resources to addressing those
actions, resulting in a frustration of LASH's mission. [Id. at
¶ 68.] Fair housing is one of the areas in which LASH provides
legal assistance to qualified applicants, and LASH also engages
in outreach and education about the legal issues that it works
on. [Id. at ¶ 62.] Housing discrimination cases like Sarafin's
are handled by LASH's Housing & Consumer Unit, which has "five
attorneys, three paralegals, one AmeriCorps member, one outreach
specialist, and one testing coordinator." [Id. at ¶ 63.]
Plaintiffs state:

        Typically, cases handled by the Housing &
        Consumer Unit are assigned a supervising
        attorney, a staff attorney, and a paralegal. In
        Sarafin's case, however, Defendants' deliberate
        indifference to the rights of HPHA tenants and
        the scope of their unlawful practices, including
        their mistreatment of Sarafin, caused the Housing
        & Consumer Unit to have to assign an additional
        attorney to matter [sic], diverting that
        attorney's time from other matters.

10

[Id. at ¶ 69.] Plaintiffs state LASH followed its usual practice
in Sarafin's case; LASH attempted informal resolutions through
Akamine, then Ouansafi, before initiating this action. See id.
at ¶¶ 70-71. However, Plaintiffs assert "[a]ddressing
Defendants' misconduct in this matter alone has consumed more
than eight times the resources LASH commits to an average
housing case." [Id. at ¶ 72.]

Apart from Sarafin's case, Plaintiffs allege LASH
diverted significant resources from 2021 to 2023 to address
Defendants' deliberate indifference to their obligations under
federal law, impairing LASH's ability to provide services to
other victims of housing discrimination. [Id. at ¶¶ 73-74.]

> To address HPHA, Ouansafi, and Akamine's
> discrimination, LASH has diverted resources from
> other mission-critical activities, including
> assistance to victims of the Maui wildfires,
> representation of other fair housing
> complainants, investigation of consumer
> complaints, and attorney involvement in LASH's
> education and outreach programs to Hawai`i's most
> vulnerable. The diversion of resources caused by
> Defendants' misconduct has also impaired LASH's
> ability to educate and enforce Hawai`i's new
> source of income discrimination law, a key
> mission-driven activity because compliance with
> that law will eliminate a barrier to housing for
> Hawai`i's poorest residents.

[Id. at ¶ 75.] This is the injury that Plaintiffs allege
entitles LASH to seek relief in the instant case. See id. at
¶ 78. Plaintiffs allege LASH's injury is ongoing because LASH is
likely to continue to "repeatedly and flagrantly mishandle[]"

11

RARs in the way similar to this case. [Id. at ¶ 79.] "LASH seeks prospective, equitable relief only enjoining Defendants' unlawful practice and ordering Defendants to undertake affirmative steps to counteract the effects of their unlawful practice." [Id. at ¶ 78.]

Plaintiffs assert the following claims: a FHA claim against Ouansafi and Akamine, in their official and individual capacities, alleging discriminatory housing practices based on disability and national origin ("Count I"); an ADA claim against HPHA and Ouansafi and Akamine, in their individual capacities ("Count II"); a Title VI claim against HPHA and Ouansafi and Akamine, in their individual capacities ("Count III"); a claim under the Rehabilitation Act against HPHA and against Ouansafi and Akamine, in their individual capacities ("Count IV"); and a claim under the Hawai`i Fair Housing Act ("HIFHA"), Hawai`i Revised Statutes Chapter 515 against HPHA, Ouansafi, and Akamine ("Count V").[4] [Id. at pgs. 35-50.]

In the instant Motion, Defendants argue the Amended Complaint should be dismissed because: LASH lacks Article III standing; the claims alleging discrimination based on national origin are time-barred; the claims against Ouansafi and Akamine,

_____

[4] Unlike the other counts, Count V does not specify whether Ouansafi and Akamine are being sued in their official capacities, their individual capacities, or both. Compare Amended Complaint at ¶¶ 85, 91, 97, and 103, with id. at ¶ 109.

in their official capacities, are barred by the Eleventh
Amendment and/or are duplicative of claims against HPHA; the
ADA, Rehabilitation Act, and Title VI claims against Ouansafi
and Akamine, in their individual capacities, fail as a matter of
law; and the claims under the FHA, Title VI, and the HFHA based
on the failure to provide interpretive services do not state
plausible claims.

     After the hearing on the instant Motion, this Court
approved the parties' stipulation to dismiss, without prejudice,
Plaintiffs' claims in Counts II, III, and IV against Ouansafi
and Akamine, in their individual capacities. See Stipulation for
Partial Dismissal Without Prejudice of Claims Against Hakim
Ouansafi and Ryan Akamine in Their Individual Capacities, and
Order, filed 7/19/24 (dkt. no. 40) ("7/19 Stipulation and
Order"). To the extent that the Motion seeks the dismissal of
the portions of Counts II, III, and IV alleging claims against
Ouansafi and Akamine, in their individual capacities, the Motion
is now moot.

**DISCUSSION**

I.  **Plaintiffs' Requests for Judicial Notice**

     Plaintiffs ask this Court to take judicial notice of:

-a complaint filed by two other LASH clients against HPHA and
    Akamine; [Plaintiffs' Request for Judicial Notice in
    Opposition to Defendants' Motion to Dismiss, filed 6/3/24
    (dkt. no. 30) ("Pltfs.' RJN"), Exh. 1 (redacted versions
    the Notice of Filing of Discrimination Complaint – Real

13

Property Transactions and Charge of Real Property
Transaction Discrimination);] and

- the HUD Office of General Counsel ("OGC") Guidance on Fair
     Housing Act Protections for Persons with Limited English
     Proficiency, dated September 15, 2016, [id., Exh. 2].

Defendants filed their objection to Plaintiffs' RJN ("RJN

Objection") on June 10, 2024 with their reply in support of the

Motion. [Dkt. no. 34.] On June 17, 2024, Plaintiffs filed a

response to the RJN Objection as well as a second request for

judicial notice ("Plaintiffs' Second RJN"). [Dkt. nos. 35, 36.]

Plaintiffs' Second RJN was filed outside of the briefing

schedule for the Motion. See Minute Order - EO: Court Order:

Denying Defendants' Motion to Dismiss Plaintiffs' Complaint as

Moot; Vacating the May 17, 2024 Hearing on that Motion; and

Setting a Hearing Date and Briefing Schedule for Defendants'

Motion to Dismiss Plaintiffs' First Amended Complaint, filed

5/8/24 (dkt. no. 27), at PageID.220 (setting briefing schedule

for the instant Motion). Because Plaintiffs' Second RJN is

untimely and Plaintiffs did not seek leave of Court to file it

outside of the briefing schedule, Plaintiffs' Second RJN is

denied.

     Turning to the merits of Plaintiffs' RJN, this Court

notes that, as a general rule, when it considers a motion to

dismiss brought pursuant to Federal Rule of Civil

Procedure 12(b)(6), it can only consider material beyond the

14

complaint if the material is incorporated by reference in the complaint or if the material is subject to judicial notice. See Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 998 (9th Cir. 2018). However, when this Court considers a motion to dismiss brought pursuant to Rule 12(b)(1), it can consider materials beyond the pleadings, even if the resolution of factual issues is required. See Helicopter Ass'n Int'l v. Hawai`i, CIV. NO. 23-00083 LEK-WRP, 2023 WL 6850157, at *3 (D. Hawai`i Oct. 17, 2023) (citing Ass'n of Am. Med. Colls. v. United States, 217 F.3d 770, 778 (9th Cir. 2000)).

> Judicial notice under Rule 201 permits a court to notice an adjudicative fact if it is "not subject to reasonable dispute." Fed. R. Evid. 201(b). A fact is "not subject to reasonable dispute" if it is "generally known," or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(1)-(2).
>
> Accordingly, "[a] court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment." Lee [v. City of Los Angeles], 250 F.3d [668,] 689 [(9th Cir. 2001)] (quotation marks and citation omitted).[5] But a court cannot take judicial notice of disputed facts contained in such public records. Id.

---

[5] Galbraith v. County of Santa Clara, 307 F.3d 1119, 1125-26 (9th Cir. 2002), overruled Lee on grounds not relevant to the issues presented in the instant Motion. See, e.g., Cortez v. Klique Car Club, Inc., Case No. 2:23-cv-07210-MEMF-MAA, 2024 WL 988374, at *1 (C.D. Cal. Mar. 6, 2024). Galbraith was abrogated on other grounds by Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). See, e.g., Higa v. Kobayashi, CIV. NO. 19-00664 LEK-WRP, 2020 WL 2027290, at *4 (D. Hawai`i Apr. 27, 2020).

Khoja, 899 F.3d at 999 (some alterations in Khoja). It is not
necessary for a court to take judicial notice when it considers
legislative facts. See, e.g., Kittel v. Advantage Physical
Therapy, 843 F. App'x 53, 56 (9th Cir. 2021).

        As to Exhibit 1, the redactions prevent this Court
from determining whether the two documents which comprise
Exhibit 1 are public records that are not subject to reasonable
dispute. Plaintiffs' RJN is therefore denied as to Exhibit 1.
Exhibit 2 is a publicly available guidance document issued by a
federal agency. See U.S. Department of Housing and Urban
Development, Office of General Counsel Guidance on Fair Housing
Act Protections for Persons with Limited English Proficiency
(Sept. 15, 2016),
https://www.hud.gov/sites/documents/LEPMEMO091516.PDF. To the
extent that this guidance is relevant to the issues in the
Motion, judicial notice is not necessary for this Court to
consider the publication. Plaintiffs' RJN is therefore denied in
its entirety.

**II.  LASH's Standing**

        As to the merits of Defendants' Motion, this Court
first turns to Defendants' argument that LASH's claims should be
dismissed for lack of standing. According to the Amended
Complaint, LASH is a nonprofit law firm that provides legal
advocacy, outreach, and education services to benefit persons

16

from disadvantaged backgrounds. [Amended Complaint at ¶ 5.]
These factual allegations are accepted as true for purposes of
the instant Motion. See Namisnak v. Uber Techs., Inc., 971 F.3d
1088, 1092 (9th Cir. 2020) ("For purposes of ruling on a motion
to dismiss for want of standing, both trial and reviewing courts
must accept as true all material allegations of the complaint
and must construe the complaint in favor of the complaining
party." (quotation marks and citation omitted)).

     The Motion's standing argument is based on the
analysis in Havens Realty Corp. v. Coleman, 455 U.S. 363 (1982),
as that case has been interpreted by the Ninth Circuit in cases
such as American Diabetes Ass'n v. U.S. Department of the Army,
938 F.3d 1147 (9th Cir. 2019). See Motion, Mem. in Supp. at 7-
15; see also Mem. in Opp. at 3-4 (Plaintiffs' description of the
analysis under Havens Realty and its progeny). In American
Diabetes Ass'n, the Ninth Circuit stated:

          under Havens Realty, an organization may
          establish "injury in fact if it can demonstrate:
          (1) frustration of its organizational mission;
          and (2) diversion of its resources to combat the
          particular [conduct] in question." Smith v. Pac.
          Props. & Dev. Corp., 358 F.3d 1097, 1105 (9th
          Cir. 2004). For example, in East Bay Sanctuary
          Covenant v. Trump, 909 F.3d 1219 (9th Cir. 2018),
          as amended by 932 F.3d 742 (9th Cir. 2018), the
          plaintiff organizations created "education and
          outreach initiatives regarding the [challenged]
          rule." Id. at 1242. In National Council of La
          Raza v. Cegavske, 800 F.3d 1032 (9th Cir. 2015),
          to counteract alleged voter registration
          violations, civil rights groups "expend[ed]

17

additional resources" that "they would have spent
on some other aspect of their organizational
purpose." Id. at 1039. In these cases, the
plaintiffs were not "simply going about their
'business as usual,'" id. at 1040-41, but had
altered their resource allocation to combat the
challenged practices . . . .

938 F.3d at 1154 (some alterations in Am. Diabetes Ass'n).

Shortly before the hearing on the Motion, the United

States Supreme Court issued its opinion in Food & Drug

Administration v. Alliance for Hippocratic Medicine

("Hippocratic Medicine"), 602 U.S. 367, 144 S. Ct. 1540, 219 L.

Ed. 2d 121 (2024). The Supreme Court reiterated that, under its

precents,

organizations may have standing "to sue on their
own behalf for injuries they have sustained."
Havens Realty Corp. v. Coleman, 455 U.S. 363,
379, n.19, 102 S. Ct. 1114, 71 L. Ed. 2d 214
(1982). In doing so, however, organizations must
satisfy the usual standards for injury in fact,
causation, and redressability that apply to
individuals. Id., at 378-379, 102 S. Ct. 1114.

Id., 144 S. Ct. at 1563. The Supreme Court rejected the

plaintiff medical associations' argument that "standing exists

when an organization diverts its resources in response to a

defendant's actions." Id. at 1564 (citing Havens, 455 U.S. 363,

102 S. Ct. 1114, 71 L. Ed. 2d 214). The Supreme Court stated

this was an incorrect reading of Havens Realty that "would mean

that all the organizations in America would have standing to

challenge almost every federal policy that they dislike,

18

provided they spend a single dollar opposing those policies."
Id. The Supreme Court emphasized that, in Havens Realty, the
defendant's "actions directly interfered with [the plaintiff
housing counseling organization's] core business activities –
not dissimilar to a retailer who sues a manufacturer for selling
defective goods to the retailer," and it held that the plaintiff
medical associations in Hippocratic Medicine did not allege that
type of injury. Id. The parties did not address Hippocratic
Medicine during the hearing on the Motion.

Approximately three months after the hearing on the
Motion, the Ninth Circuit issued an opinion addressing the
effect that Hippocratic Medicine has on Ninth Circuit case law
regarding organizational standing. See Ariz. All. for Retired
Ams. v. Mays, 117 F.4th 1165 (9th Cir. 2024). The Ninth Circuit
held that Hippocratic Medicine "put a halt to" the Ninth
Circuit's "confusing line of organizational standing cases that
have broadly construed Havens Realty v. Coleman, 455 U.S. 363,
102 S. Ct. 1114, 71 L. Ed. 2d 214 (1982), as allowing an
organization to assert standing if it diverts resources in
response to a governmental policy that frustrates its mission."
Id. at 1169-70. The Ninth Circuit further noted that "the
Supreme Court in Hippocratic Medicine squarely rejected the sort
of 'expansive theory' of Havens Realty standing that has long
been a hallmark of [Ninth Circuit] jurisprudence," id. at 1170

19

(citing Hippocratic Med., 602 U.S. at 395-96, 144 S. Ct. 1540),
and the Ninth Circuit concluded that its "organizational
standing precedents are irreconcilable with the Supreme Court's
recent decision in Hippocratic Medicine," id. Thus, Hippocratic
Medicine has overruled Ninth Circuit organizational standing
precents. Id. at 1178; see also Miller v. Gammie, 335 F.3d 889,
900 (9th Cir. 2003) (en banc) (holding that, where "the relevant
court of last resort . . . undercut the theory or reasoning
underlying the prior [Ninth C]ircuit precedent in such a way
that the cases are clearly irreconcilable," Ninth Circuit three-
judge panels and district courts within the Ninth Circuit
"should consider themselves bound by the intervening higher
authority and reject the prior opinion of this court as having
been effectively overruled").

        Under Hippocratic Medicine and Arizona Alliance, in
determining whether LASH has organizational standing, this Court
must apply "the traditional three-part Article III standing
analysis: (1) injury-in-fact, (2) causation, and
(3) redressability." See id. Thus, this Court rejects
Plaintiffs' argument that this Court should analyze LASH's
standing under Havens Realty. See Pltfs' Suppl. Mem. at 1-8.
First, it is clear that the Supreme Court has rejected the
interpretation of Havens Realty that has been applied in the
Ninth Circuit. See Hippocratic Med., 144 S. Ct. at 1564. Second,

20

although <u>Havens Realty</u> itself remains good law, the Supreme
Court has stated it "was an unusual case," which the Supreme
Court "has been careful not to extend . . . beyond its context."
<u>See</u> <u>Hippocratic Med.</u>, 144 S. Ct. at 1564. LASH does not allege
the same type of injury that the plaintiff in <u>Havens Realty</u>
alleged, a direct effect upon and interference with its "core
business activities – not dissimilar to a retailer who sues a
manufacturer for selling defective goods to the retailer." <u>See</u>
<u>id.</u> LASH does not allege the same type of injury here.

LASH's "mission is to address critical legal needs
through high quality legal advocacy, outreach, and education in
the pursuit of fairness and justice." [Amended Complaint at
¶ 60.] LASH "provides assistance to qualified applicants in the
areas of family law, immigration, public benefits, simple estate
planning, landlord-tenant, consumer, and fair housing, among
others" and "engages in extensive outreach and education
throughout Hawai`i to increase awareness and knowledge about
many legal issues that affect Hawai`i's lowest income
residents." [<u>Id.</u> at ¶ 62.]

Providing legal representation to Sarafin in his
attempts to secure an accessible housing unit is squarely within
one of the aspects of LASH's mission. Plaintiffs acknowledge
that LASH is funded, in part, by HUD's Fair Housing Initiative
Program and, under that program "LASH receives fair housing

21

complaints, conducts fair housing investigations, and seeks
enforcement of fair housing laws by pursuing administrative
complaints and lawsuits that result in consent decrees and legal
settlements." See id. at ¶ 5. Thus, the representation that LASH
has provided to Sarafin and the general fair housing advocacy
that it has engaged in with HPHA are within the scope of the HUD
program that LASH operates. Further, the fact that Sarafin's
case has been more complicated than the cases that LASH's
Housing & Consumer Unit typically handles does not constitute
interference with LASH's core business activities. LASH was only
required to assign one additional attorney from within the
Housing & Consumer Unit to Sarafin's case, leaving at least two
other attorneys in the unit available to handle other matters.
See Amended Complaint at ¶ 69 (assignment of additional
attorney); id. at ¶ 63 (stating the unit has five attorneys).
Similarly, the fact that responding to Defendants' allegedly
discriminatory housing practices in general has caused LASH to
reduce the time and resources it expends on "other mission-
critical activities," see id. at ¶ 75, does not constitute an
actionable injury in fact under Hippocratic Medicine and Arizona
Alliance because such harm must be "an actual and concrete harm"
that "directly and actually affect[s] the organization's 'core'
activities, not merely its 'abstract social interests.'" See

22

Ariz. All., 117 F.4th at 1177 (quoting Hippocratic Med., 602

U.S. at 395, 144 S. Ct. 1540).

> No matter how much a defendant's conduct can be
> said to frustrate an organization's abstract
> mission, alleged injuries to an organization's
> "general legal, moral, ideological, and policy
> concerns do not suffice on their own to confer
> Article III standing to sue in federal court."
> Hippocratic Medicine, 602 U.S. at 386, 144 S. Ct.
> 1540; see also id. at 394, 144 S. Ct. 1540
> (holding that the plaintiffs organizations'
> argument that the FDA's challenged policy "has
> 'impaired' their 'ability to provide services and
> achieve their organizational missions'" "does not
> work to demonstrate standing").

Id. The type of standing allegations asserted in Amended

Complaint has been rejected in Hippocratic Medicine and Arizona

Alliance.

        Thus, Plaintiffs have not clearly alleged facts

demonstrating the injury in fact element of LASH's standing. See

Namisnak, 971 F.3d at 1092 (9th Cir. 2020) (stating that, in

reviewing a motion to dismiss for lack of standing, the issue is

"whether the plaintiffs have 'clearly allege[d] facts

demonstrating each element' of standing" (brackets in Namisnak)

(quoting Spokeo v. Robins, --- U.S. ----, 136 S. Ct. 1540, 1547,

194 L. Ed. 2d 635 (2016))). Defendants' Motion is therefore

granted insofar as LASH's claims in the Amended Complaint are

dismissed.

        "Dismissal with prejudice and without leave to amend

is not appropriate unless it is clear . . . that the complaint

could not be saved by amendment." See <u>Hoang v. Bank of Am.,</u>
<u>N.A.</u>, 910 F.3d 1096, 1102 (9th Cir. 2018) (quotation marks and
citation omitted). In the 10/3 EO, this Court directed the
parties to address whether Plaintiffs would be able to plead
sufficient factual allegations in a second amended complaint to
plead a basis for LASH's standing under <u>Hippocratic Medicine</u> and
<u>Arizona Alliance</u>. <u>See</u> 10/3 EO at PageID.373. Plaintiffs argue
that, if permitted to amend file a second amended complaint,
they would add further allegations regarding "the risk of
economic injury to LASH" that is created by Defendants'
allegedly discriminatory housing practices. [Pltfs.' Suppl. Mem.
at 9.] Plaintiffs contend Defendants' discriminatory practices
"impair[ LASH's] enforcement activities including organization
initiated settlements" and "threaten[] its ability to discharge
its obligation under the [Fair Housing Initiatives Program] and
its compliance with its contractual obligations with HUD." <u>See</u>
<u>id.</u> at 10. It is doubtful that Plaintiffs can plead plausible
factual allegations to support these positions. However, this
Court is unable to find that LASH's claims cannot be saved by
any amendment. <u>See</u> <u>Hoang</u>, 910 F.3d at 1102. The dismissal of
LASH's claims must therefore be without prejudice.

## III. <u>Timeliness of Sarafin's Claims</u>

As to Sarafin's claims, Defendants first argue the
portions of Counts I, III, and V alleging national origin

24

discrimination claims are untimely. [Motion, Mem. in Supp. at 1, 17-19.] Sarafin contends those claims are timely because the challenged conduct is part of a series of continuing violations. See Mem. in Opp. at 14-17.

> **A.**    **FHA**

>> Under the FHA,

>> An aggrieved person may commence a civil action in an appropriate United States district court or State court not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice, or the breach of a conciliation agreement entered into under this subchapter, whichever occurs last, to obtain appropriate relief with respect to such discriminatory housing practice or breach.

42 U.S.C. § 3613(a)(1)(A). The continuing violation doctrine was codified in this provision when Congress "amend[ed] the FHA to include both 'the occurrence [and] **the termination** of an alleged discriminatory housing practice' as events triggering the two-year statute of limitations." Garcia v. Brockway, 526 F.3d 456, 462 (9th Cir. 2008) (en banc) (emphasis in Garcia) (quoting 42 U.S.C. § 3613(a)(1)(A)). However, a continuing violation should not be confused with the ongoing effects of a past violation. See id. ("[A] continuing violation is occasioned by continual unlawful acts, not by continual ill effects from an original violation." (quotation marks and citations omitted)).

B.    **Title VI**

  The Ninth Circuit has held that the same limitations period that applies to claims under Title 42 United States Code Section 1983 applies to Title VI claims. Taylor v. Regents of the Univ. of Cal., 993 F.2d 710, 712 (9th Cir. 1993) (per curiam). Thus, Hawai`i Revised Statutes Section 657-7, "the state's general statute of limitations for personal injury actions," applies to Title VI claims. See Imamoto v. Soc. Sec. Admin., Civil No. 08-00137 JMS/KSC, 2008 WL 4657811, at *4 (D. Hawai`i Oct. 21, 2008) (citing Stanley v. Trs. of the Cal. State Univ., 433 F.3d 1129, 1134 (9th Cir. 2006)).

  There does not appear to be any controlling case law addressing whether the Title VI limitations period is subject to the continuing violation doctrine, nor is there such case law from district courts within the Ninth Circuit. Courts outside of the Ninth Circuit apply the doctrine. See, e.g., Sewell v. Monroe City Sch. Bd., 974 F.3d 577, 583-84 & n.2 (5th Cir. 2020); Maisha v. Univ. of N. Carolina, 641 F. App'x 246, 249 (4th Cir. 2016). This Court finds the analysis in these out-of-circuit cases persuasive and concludes that the continuing violation doctrine applies to Title VI claims.

26

C.    **HIFHA**

Hawai`i Revised Statutes Section 515-9(b) states:

Nothing in [Hawai`i Revised Statutes] chapter 368
or this section shall be deemed to preclude an
aggrieved person from filing a civil action for
discriminatory practices made unlawful by this
chapter no later than two years after the
occurrence or the termination of an alleged
discriminatory practice; provided that,
notwithstanding [Hawai`i Revised Statutes]
section 368-12, the commission shall issue a
right to sue on a complaint filed with the
commission if it determines that a civil action
alleging similar facts has been filed.

There is apparently no case law addressing whether the
continuing violation doctrine applies to Section 515-9(b). This
Court therefore "must predict how the highest state court would
decide the issue using intermediate appellate court decisions,
decisions from other jurisdictions, statutes, treatises, and
restatements as guidance." Trishan Air, Inc. v. Fed. Ins. Co.,
635 F.3d 422, 427 (9th Cir. 2011) (quotation marks and citation
omitted). Based on the similarity in the language of
Section 515-9(b) and the language of Title 42 United States Code
Section 3613(a)(1)(A), this Court predicts that the Hawai`i
Supreme Court would hold that the continuing violation doctrine
applies to Section 515-9(b).

D.    **Whether Sarafin's National Origin Claims Are Timely**

First, Sarafin emphasizes that the Amended Complaint
includes allegations regarding incidents that occurred within

27

the two-year period before the filing of this action on
February 11, 2024. [Mem. in Opp. at 14 (citing Amended Complaint
at ¶¶ 57-59).] Paragraph 57 alleges HPHA failed to include its
LEP Disclosure Form with Sarafin's annual Notice of
Reexamination, dated December 29, 2022. [Amended Complaint at
pg. 27.] Paragraph 58 alleges Sarafin "repeatedly" called the
telephone number listed on HPHA's LEP Disclosure Notice to
request interpretative services, but he did not receive the
services. [Id. at pg. 28.] As examples, paragraph 58 cites
Sarafin's two calls on March 19, 2024 and his four calls on
March 22, 2024. [Id.] Paragraph 59 describes, without stating
any dates, instances when HPHA provided Sarafin with an
interpreter who spoke the Mortlockese dialect of the Chuukese
language. Because Sarafin does not speak or understand that
Mortlockese dialect, the interpretative services offered were of
no benefit to Sarafin. [Id.] Paragraph 59 also alleges, again
without stating dates, that, when an interpreter who spoke the
dialect that Sarafin speaks was provided, the interpreter was
"often" available for such a limited time period that Sarafin
was not able "to express his concerns to HPHA." [Id.]

The Amended Complaint also refers to: "several
occasions" in 2020 when Sarafin attempted to speak to Wiggett
about his need to transfer units, but Wiggett failed to offer
interpretation services; [id. at ¶ 25;] Sarafin's March 4, 2021

28

RAR, which stated he needed a Chuukese interpreter to discuss his request; [id. at ¶ 26;] and Sarafin's July 9, 2021 RAR, which repeated the request for a Chuukese interpreter to discuss the request, [id. at ¶ 28].[6] These alleged incidents occurred more than two years before the filing of the instant case.

Defendants do not argue that Sarafin's disability discrimination claims are untimely. However, the application of the continuing violation doctrine to ADA claims is instructive. In the employment context, this district court has stated:

> The [continuing violation] doctrine distinguishes between discrete acts of discrimination and hostile work environment claims. A discrete act consists of an unlawful practice that "occurred" on the day it "happened," and includes, for example, "termination, failure to promote, denial of transfer, or refusal to hire." [Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S 101,] 114 [(2002).[7]] In comparison, hostile work environment claims "are based on the cumulative effect of individual acts," "occur[ing] over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." Id. at 103 (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). Thus, "provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of

---

[6] Sarafin states HPHA failed to respond to the March 4, 2021 RAR and the July 9, 2021 RAR. See Amended Complaint at ¶¶ 28, 30.

[7] National Railroad was superseded on other grounds by the Lily Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2, 123 Stat. 5. See, e.g., Gipaya v. Dep't of the Air Force, 345 F. Supp. 3d 1286, 1297 n.3 (D. Hawai`i 2018), aff'd sub nom. Gipaya v. Barrett, 803 F. App'x 111 (9th Cir. 2020).

determining liability. . . . the employee need
only file a charge within [the relevant time
period] of any act that is part of the hostile
work environment." Id. at 117–18.

Makekau v. Charter Commc'ns, LLC, CIV. NO. 21-00267 JMS-RT, 2023
WL 1966422, at *4 (D. Hawai`i Feb. 13, 2023) (some alterations
in Makekau). Thus, "[e]ach denial of a request for an ADA
accommodation constitutes a separate and discrete discriminatory
act, subject to its own unique statute of limitations timeline."
Id. (citing Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S 101,
114 (2002) (identifying "termination, failure to promote, denial
of transfer, [and] refusal to hire" as examples of "[d]iscrete
acts," because these acts "'occur[]' within the appropriate time
period")).

        Sarafin's allegations do not meet the definition of a
continuing violation. Rather, each alleged failure to provide
interpretative services is a discrete act of discrimination. The
incidents that occurred more than two years prior to the filing
of this action are time-barred, but Sarafin can rely on them as
background facts to support his claims that are based on timely
incidents. See, e.g., Begley v. Cnty. of Kaua`i, CIVIL 16-00350
LEK-KJM, 2018 WL 295799, at *4 (D. Hawai`i Jan. 4, 2018) (citing
Kosegarten v. Dep't of the Prosecuting Att'y, 892 F. Supp. 2d
1245, 1263 (D. Hawai`i 2012)). To the extent that the Motion
seeks the dismissal of Sarafin's national origin discrimination

claims on the ground that they are time-barred, the Motion is
denied.[8] This ruling is limited to the statute of limitations
issue, and the issue of whether Sarafin has pled sufficient
factual allegations to state plausible claims for national
origin discrimination will be addressed *infra*.

## IV.  Eleventh Amendment Immunity

Among the relief that Sarafin seeks is declaratory and
injunctive relief against all Defendants. See Amended Complaint
at ¶¶ 112.a-c. Defendants argue the claims seeking prospective
injunctive relief against Ouansafi and Akamine, in their
official capacities, are barred by the Eleventh Amendment
because Sarafin does not plead sufficient factual allegations
regarding the necessary enforcement nexus. [Motion, Mem. in
Supp. at 19-20.] Defendants' Motion does not assert an Eleventh
Amendment argument as to Sarafin's claims against HPHA. See id.
at 19-21.

"The ultimate guarantee of the Eleventh Amendment is
that nonconsenting States may not be sued by private individuals
in federal court." Bd. of Trs. of Univ. of Ala. v. Garrett, 531
U.S. 356, 363 (2001) (citation omitted); see also U.S. Const.,
amend. XI ("The Judicial power of the United States shall not be

---

[8] Although Defendants have not moved to dismiss Sarafin's
disability discrimination claims on statute of limitations
grounds, this Court notes that it would apply the same
continuing violation analysis to those claims.

construed to extend to any suit in law or equity, commenced or
prosecuted against one of the United States by Citizens of
another State, or by Citizens or Subjects of any Foreign
State."). "It is well established that agencies of the state are
immune under the Eleventh Amendment from private damages or
suits for injunctive relief brought in federal court." Sato v.
Orange Cnty. Dep't of Educ., 861 F.3d 923, 928 (9th Cir. 2017)
(citation and quotation marks omitted); see also P.R. Aqueduct &
Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 144 (1993)
("Absent waiver, neither a State nor agencies acting under its
control may be subject to suit in federal court." (citations and
internal quotation marks omitted)). As such, "[s]tates, their
agencies, and their officials in their official capacities are
immune from damage suits under state or federal law by private
parties in federal court unless there is a valid abrogation of
that immunity or an unequivocal express waiver by the state."
Monet v. Hawai`i, Civ. No. 11-00211 SOM/RLP, 2011 WL 2446310, at
*4 (D. Hawai`i June 14, 2011) (some citations omitted) (citing
Sossamon v. Tex., 131 S. Ct. 1651, 1658 (2011)).

> Under the Ex parte Young exception to
> Eleventh Amendment immunity, however,
> "private individuals may sue state officials
> in federal court for prospective relief from
> ongoing violations of federal law, as
> opposed to money damages, without running
> afoul of the doctrine of sovereign
> immunity." Koala v. Khosla, 931 F.3d 887,
> 895 (9th Cir. 2019) (citing Va. Office for

Prot. & Advocacy v. Stewart, 563 U.S. 247,
254-55 (2011)); see also Ex parte Young, 209
U.S. 123 (1908). Ex parte Young is based on
the proposition "that when a federal court
commands a state official to do nothing more
than refrain from violating federal law, he
is not the State for sovereign-immunity
purposes." Va. Office for Prot. & Advocacy,
563 U.S. at 255 (citation omitted).

   In determining whether the Ex parte
Young doctrine avoids an Eleventh Amendment
bar to suit, a court conducts a
"straightforward inquiry" into whether the
complaint (1) alleges an ongoing violation
of federal law, and (2) seeks relief
properly characterized as prospective.
Verizon Md., Inc. v. Pub. Serv. Comm'n of
Md., 535 U.S. 635, 645 (2002) (quoting Idaho
v. Coeur d'Alene Tribe of Idaho, 521 U.S.
261, 296 (1997) (O'Connor, J., joined by
Scalia and Thomas, JJ., concurring in part
and concurring in judgment); 521 U.S. at
298-299 (Souter, J., joined by Stevens,
Ginsburg, and Breyer, JJ.,
dissenting)). . . .

Duke's Invs. LLC v. Char, CIVIL NO. 22-00385 JAO-
RT, 2023 WL 3166729, at *6 (D. Hawai`i Apr. 28,
2023).

   Further, under Ex parte Young, the state
officer "'must have some connection with
enforcement of the act.'" Coal. to Defend
Affirmative Action v. Brown, 674 F.3d 1128, 1134
(9th Cir. 2012) (quoting Ex parte Young, 209 U.S.
at 157, 28 S. Ct. 441). The connection
requirement is a modest one, and "demands merely
that the implicated state official have a
relevant role that goes beyond 'a generalized
duty to enforce state law or general supervisory
power over the persons responsible for enforcing
the challenged provision.'" Mecinas v. Hobbs, 30
F.4th 890, 903-04 (9th Cir. 2022) (quoting
Planned Parenthood of Idaho, Inc. v. Wasden, 376
F.3d 908, 919 (9th Cir. 2004)).

Helicopter Ass'n Int'l v. Hawai`i, CIV. NO. 23-00083 LEK-WRP,
2023 WL 6850157, at *5 (D. Hawai`i Oct. 17, 2023) (alterations
in Helicopter Ass'n).

   Sarafin seeks an injunction prohibiting Defendants
from "discriminating on the basis of disability or national
origin, including Limited English Proficiency" and requiring
Defendants "to undertake affirmative steps to correct their
discriminatory practice and counteract the effects of their
discriminatory practices." [Amended Complaint at ¶¶ 112.b-c.]
According to the Amended Complaint, as HPHA's Executive
Director, "Ouansafi is responsible for HPHA's compliance with
federal and state laws prohibiting discrimination in HPHA's
housing, programs, and services" and "is specifically charged
with supervision, implementation, and reporting HPHA's
compliance with federal and state civil rights statutes." [Id.
at ¶ 7.] As HPHA's Chief Compliance Officer and Section 504
Coordinator, "Akamine is responsible for implementing and
executing HPHA's compliance with federal and state laws that
prohibit discrimination in HPHA's housing, programs, and
services" and "is specifically charged with the implementation,
evaluation, and determination of requests for reasonable
accommodation and modification and for the provision of
interpretation services to LEP persons." [Id. at ¶ 8.] Sarafin's
allegations regarding Ouansafi's role and Akamine's role are

taken as true for purposes of the instant Motion, and these
allegations are sufficient, at the pleadings stage, to support
Sarafin's position that Ouansafi and Akamine each will have a
role in implementing the prospective injunctive relief if
Sarafin prevails and obtains the relief he seeks in this case.

Defendants also argue the claims for prospective
injunctive relief against Ouansafi and Akamine, in their
official capacities, are duplicative of the claims against HPHA
and should be dismissed. [Motion, Mem. in Supp. at 20-21.]
Defendants' argument is misplaced. Count I is not alleged
against HPA. See Amended Complaint at ¶ 85 & n.4. Following the
7/19 Stipulation and Order, Counts II, III, and IV are only
asserted against HPHA. See id. at ¶¶ 91, 97, 103. There is no
duplication of claims as to Counts I, II, III, and IV. As
previously noted, Count V is asserted against all Defendants,
but it is unclear whether Ouansafi and Akamine are being sued in
their official capacities, their individual capacities, or both.
See id. at ¶ 109. Even if there is duplication of the claim
against HPHA in Count V and a claim against Ouansafi and
Akamine, in their official capacities, in Count V, the
duplication would not require dismissal under the circumstances
of this case.

To the extent that the Motion seeks dismissal of
Sarafin's claims against Ouansafi and Akamine, in their official

35

capacities, based on Eleventh Amendment immunity, the Motion is
denied.

**V.    Failure to State a Claim**

**A.    Ouansafi and Akamine**

Defendants argue Sarafin's claims against Ouansafi and
Akamine, in their individual capacities, in Count I and
Sarafin's claim against in them in Count V fail to state a claim
upon which relief can be granted. [Motion, Mem. in Supp. at 21-
24.]

**1.    FHA**

As to Count I, Defendants argue Sarafin brings his
claims against Ouansafi and Akamine, in their individual
capacities, pursuant to Title 24 Code of Federal Regulations
Section 100.7, which Defendants contend does not allow an FHA
claim to be brought against an individual based solely on his
supervision of employee who committed an FHA violation. [Id. at
21-23 (discussing Fair Hous. Council of Riverside Cnty., Inc. v.
Grp. XIII Properties LP, Case No. EDCV 21-941 JGB (KKx), 2023 WL
4680764, at *29, 30 (C.D. Cal. Apr. 27, 2023)).]

Section 100.7 states:

(a)  Direct liability.

(1)  A person is directly liable for:

(i)  The person's own conduct that results
in a discriminatory housing practice.

36

> > (ii) Failing to take prompt action to
> > correct and end a discriminatory housing
> > practice by that person's employee or agent,
> > where the person knew or should have known
> > of the discriminatory conduct.
>
> > (iii) Failing to take prompt action to
> > correct and end a discriminatory housing
> > practice by a third-party, where the person
> > knew or should have known of the
> > discriminatory conduct and had the power to
> > correct it. The power to take prompt action
> > to correct and end a discriminatory housing
> > practice by a third-party depends upon the
> > extent of the person's control or any other
> > legal responsibility the person may have
> > with respect to the conduct of such third-
> > party.
>
> (2)   For purposes of determining liability under
> paragraphs (a)(1)(ii) and (iii) of this section,
> prompt action to correct and end the
> discriminatory housing practice may not include
> any action that penalizes or harms the aggrieved
> person, such as eviction of the aggrieved person.
>
> (b)   Vicarious liability. A person is vicariously
> liable for a discriminatory housing practice by
> the person's agent or employee, regardless of
> whether the person knew or should have known of
> the conduct that resulted in a discriminatory
> housing practice, consistent with agency law.

Section 100.7 is cited in Count I. See Amended Complaint at ¶ 85

& n.4 ("Ouansafi and Akamine are named as defendants in either

their official or personal capacities or both under the Ex Parte

Young doctrine and for their personal responsibility for the

commission or omission of conduct that injured each plaintiff.

24 C.F.R. § 100.7.").

Plaintiffs do not refer to vicarious liability in the Amended Complaint. Thus, they do not bring Count I against Ouansafi and Akamine, in their individual capacities, based on Section 100.7 vicarious liability. Accord Mem. in Opp. at 22 (stating Plaintiffs "do not claim that Ouansafi and Akamine are vicariously liable for the act of others"). Section IV.E of the Memorandum in Support of Motion only seeks dismissal of the portion of Count I against Ouansafi and Akamine, in their individual capacities, on the ground that Count I fails to state an FHA claim against them based on vicarious liability.[9] See Motion, Mem. in Supp. at 21-23. Because Sarafin's FHA claim against Ouansafi and Akamine, in their individual capacities, is not based on vicarious liability, the Motion is denied as to that request.

---

[9] At the hearing on the Motion, Defendants' counsel argued the Motion does not only challenge the argument that Ouansafi and Akamine, in their individual capacities, are vicariously liable under the FHA and Section 100.7. Defendants' counsel noted that Section 100.7 also addresses direct liability, and counsel asserted the Motion raises the failure to plead direct action by Ouansafi and Akamine. Section IV.G of the Memorandum in Support of Motion raises this argument as to the portion of Count I alleging the failure to provide interpretative services. See Motion, Mem. in Supp. at 24-25. Section IV.E, however, does not. This Court therefore does not construe Defendants' Motion as seeking dismissal of the portion of Count I against Ouansafi and Akamine, in their individual capacities, based on direct liability.

2.    **HIFHA**

Hawai`i Revised Statutes Section 515-9(b) authorizes
the filing of a civil action to address discriminatory practices
rendered unlawful by Chapter 515. "'Discriminatory practice'
means a practice designated as discriminatory under the terms of
this chapter. Haw. Rev. Stat. § 515-2. Hawai`i Revised Statutes
Section 515-3(a) states:

> It is a discriminatory practice for an owner or
> any other person engaging in a real estate
> transaction, or for a real estate broker or
> salesperson, because of race; sex, including
> gender identity or expression; sexual
> orientation; color; religion; marital status;
> familial status; ancestry; disability; age; or
> human immunodeficiency virus infection[.]

Section 515-3(a) lists various actions that constitute
discriminatory practices, including "[t]o discriminate against a
person in the terms, conditions, or privileges of a real estate
transaction or in the furnishing of facilities or services in
connection with a real estate transaction." Haw. Rev. Stat.
§ 515-3(a)(2).

Sarafin concedes that Ouansafi and Akamine are not
property owners, nor are they real estate brokers or
salespersons. See Mem. in Opp. at 25. Further, it is undisputed
that Ouansafi and Akamine are persons for purposes of the HIFHA.
See Haw. Rev. Stat. § 515-2 (definition of "Person" (citing Haw.
Rev. Stat. § 1-19)). The issue is whether Ouansafi and Akamine

39

are "person[s] engag[ed] in [] real estate transaction[s]." <u>See</u>
Haw. Rev. Stat. § 515-3(a). Under the HIFHA, a "'[r]eal estate
transaction' includes the sale, exchange, rental, or lease of
real property." Haw. Rev. Stat. § 515-2.

      Based on the description of Ouansafi's and Akamine's
respective duties, their positions are involved in agency-wide
supervision and policy implementation and execution. <u>See</u> Amended
Complaint at ¶¶ 7-8. The Amended Complaint notes some agreements
that Ouansafi has executed on behalf of HPHA. <u>See, e.g.</u>, <u>id.</u> at
¶ 14 (Ouansafi executes HPHA's Annual Contributions Contract
with HUD); <u>id.</u> at ¶ 52 (Ouansafi executed the Compliance
Agreement on behalf of HPHA in a HUD case). But, the noted
agreements are not individual real estate transactions; they are
agreements regarding HPHA's housing program in general. The
Amended Complaint does not allege adequate factual allegations
to support Sarafin's position that Ouansafi and Akamine are
persons engaged in the relevant real estate transactions in this
case.

      Count V fails to plead a plausible HPHA claim against
Ouansafi and Akamine. <u>See</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678
(2009) ("To survive a motion to dismiss, a complaint must
contain sufficient factual matter, accepted as true, to state a
claim to relief that is plausible on its face." (citation and
internal quotation marks omitted)). Defendants' Motion is

granted insofar as Sarafin's claim against Ouansafi and Akamine in Count V is dismissed. The dismissal is without prejudice because it is arguably possible for Sarafin to cure the defect in this claim by amendment. See Hoang, 910 F.3d at 1102.

    **B.**    **National Origin Discrimination Claims**

        Defendants next argue the portions of Sarafin's claims in Counts I, III, V alleging national origin discrimination based on the failure to provide interpretative services fail to state a claim upon which relief can be granted. [Motion, Mem. in Supp. at 24-25.] Defendants contend the Amended Complaint "fails to plead any facts showing that Sarafin's alleged injury occurred 'because of' his national origin and/or his identification as a LEP person." [Id. at 25.]

        Sarafin acknowledges that the Amended Complaint does not plead "sufficient granular factual allegations to tie [the denial of interpretive services] to Ouansafi and Akamine in their personal capacities." [Mem. in Opp. at 30.] In light of this concession, Defendants' Motion is granted as to the portions of Count I alleging claims against Ouansafi and Akamine, in their individual capacities, for national origin discrimination based upon the denial of interpretive services. Those portions of Count I are dismissed.

        The claims in Count III against Ouansafi and Akamine, in their individual capacities, have already been dismissed

41

without prejudice in the 7/19 Stipulation and Order, and the claims in Count V against Ouansafi and Akamine were dismissed *supra* because the Amended Complaint does not allege they are engaged in the relevant real estate transactions in this case. Remaining before this Court are Sarafin's claims based upon the denial of interpretive services in: Count I against Ouansafi and Akamine, in their official capacities; Count III against HPHA; and Count V against HPHA.

In a putative action challenging the state's policy of only offering the driver's license examination test in English, this district court has stated:

> Plaintiffs cannot prevail in this case by simply showing that the English-only policy disproportionately harms LEP individuals, or that Hawaii officials have an animus against LEP individuals for reasons unrelated to membership in a protected class. For example, even if Plaintiffs could show that the English-only policy was created in part because officials dislike having people in Hawaii who do not speak English, that alone would not suffice to prevail on the merits. Of course "language is close[ly related to] national origin [and] restrictions on the use of languages may mask discrimination against specific national origin groups or, more generally, conceal nativist sentiment." Yniguez v. Arizonans for Official English, 69 F.3d 920, 947–48 (9th Cir.1995), *judgment vacated on other grounds by* Arizonans for Official English v. Arizona, 520 U.S. 43 (1997). Still, Plaintiffs would ultimately have to demonstrate that animus against LEP individuals, or any particular linguistic group, reflects an underlying animus based on national origin.

Faith Action for Cmty. Equity v. Hawai`i, Civil No. 13-00450
SOM/RLP, 2014 WL 1691622, at *11 (D. Hawai`i Apr. 28, 2014)
(alterations in Faith Action). In that case, the district court
ruled that the plaintiffs' "First Amended Complaint allege[d]
three sets of facts that, if true, could lead to the reasonable
inference that Defendants acted with discriminatory animus
against individuals originating from nations where English is
not the primary language." Id. at *12. The plaintiffs alleged:
the defendants knew or should have known that the English-only
policy had a disparate impact on persons from nations where
English is not the primary language; the defendants' decision-
making was pretextual on its face; and the plaintiffs had direct
evidence of discriminatory animus. Id. at *12-14.

        Considering the factual allegations of the Amended
Complaint in light of the HUD OGC guidance regarding FHA
protections for persons with LEP, this Court concludes that
Sarafin has sufficiently pled a nexus between LEP status and
national origin for purposes of his FHA, Title VI, and HIFHA
national origin discrimination claims. However, the Amended
Complaint does not include allegations that, if proven, would
support a reasonable inference that the remaining defendants
acted with discriminatory animus against Sarafin based on his
national origin. The remaining portions of Counts I, III, and V
that are based upon the denial of interpretive services fail to

43

state plausible FHA, Title VI, and HIFHA national origin discrimination claims. See Iqbal, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." (citation omitted)). Those claims are therefore dismissed, but the dismissal is without prejudice because it arguably possible for Sarafin to cure the defects in those claims by amendment.

     **C.**   **Scope of the Motion**

     The Motion asks this Court to dismiss the Amended Complaint in its entirety. See Motion at 2; id., Mem. in Supp. at 25. However, the Motion does not present any specific arguments challenging the sufficiency of the allegations supporting Sarafin's claims in Counts II and IV, nor the portions of Counts I, III, and V alleging disability discrimination. To the extent that the Motion seeks the dismissal of those claims, the Motion is denied.

**CONCLUSION**

     For the foregoing reasons, Defendants' Motion to Dismiss Plaintiff's First Amended Complaint, filed May 6, 2024, is HEREBY GRANTED IN PART AND DENIED IN PART. Defendants' Motion is GRANTED insofar as:

-all of LASH's claims are dismissed without prejudice;

44

-Sarafin's claims against Ouansafi and Akamine in Count V are
     dismissed without prejudice;

-the portions of Count I alleging claims against Ouansafi and
     Akamine, in their official and individual capacities, for
     national origin discrimination based on the denial of
     interpretative services are dismissed without prejudice;
     and

-the portions of Counts III and V alleging a claim against HPHA
     for national origin discrimination based on the denial of
     interpretative services are dismissed without prejudice.

Defendants' Motion is DENIED in all other respects.

          As to the claims that have been dismissed without

prejudice, Sarafin is GRANTED leave to file a second amended

complaint by **January 29, 2025**. If Sarafin chooses not to file a

second amended complaint, this case will proceed as to the

remaining portions of the Amended Complaint.

          IT IS SO ORDERED.

          DATED AT HONOLULU, HAWAII, December 30, 2024.



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
Senior U.S. District Judge

SARAFIN ET AL. V. HAWAI`I PUB. HOUS. AUTH. ET AL., CIV. NO. 24-
00066 LEK-WRP; ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED
COMPLAINT AND DENYING PLAINTIFFS' REQUESTS FOR JUDICIAL NOTICE